**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTINA HO | : | |
| 1300 Fairmount Ave., Unit 820 | : | CIVIL ACTION |
| Philadelphia, PA 19123 | : | |
| | : | CASE NO.: |
| Plaintiff, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| THE OSBORN ENGINEERING CO. | : | |
| d/b/a OSPORTS | : | |
| 111 Superior Ave., E Ste. 2100 | : | |
| Cleveland, OH 44114 | : | |
| | : | |
| Defendant. | : | |
| | : | |

**CIVIL ACTION COMPLAINT**

Christina Ho (hereinafter referred to as "Plaintiff," unless indicated otherwise), by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1.     This action has been initiated by Plaintiff against The Osborn Engineering Co., d/b/a OSPORTS (hereinafter referred to as "Defendant") of the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101, et. seq.) and the Philadelphia Fair Practices Ordinance ("PFPO").[1] Plaintiff asserts, *inter alia*, that she experienced unlawful workplace discrimination and retaliation, culminating in her termination from Defendant. As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff's claim under the PFPO is referenced herein for notice purposes. She is required to wait 1 full year before initiating a lawsuit for date of dual-filing with the EEOC. Plaintiff must however file her lawsuit in advance of same because of the date of issuance of her federal right-to-sue letter under the ADA. Plaintiff's claims under the PFPO will mirror her ADA claims asserted herein.

1

**JURISDICTION AND VENUE**

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.

3.      There lies supplemental jurisdiction over Plaintiff's future state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

4.      This Court may properly assert personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the *United States Supreme Court in Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

5.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where they are subjected to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

6.      Plaintiff is proceeding herein under the ADA after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety ("90") days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

**PARTIES**

7.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

8.    Plaintiff is an adult individual with an address as set forth in the caption.

9.    Defendant is an architectural and engineering firm based in Cleveland, OH, with other office locations throughout the United States, including the location at which Plaintiff worked in Philadelphia PA.

10.    At all relevant times herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendant.

## **FACTUAL BACKGROUND**

11.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12.    Plaintiff was hired by Defendant on or about October 7, 2022.

13.    At all times relevant during her employment with Defendant, Plaintiff was employed as a Senior Architectural Designer in Defendant's OSPORTS division (focusing on sports and entertainment architecture) in Philadelphia, PA.

14.    On or about October 7, 2024, Plaintiff began to suffer from various disabilities, including but not limited to disabilities related to her back, hip, shoulder, wrist, head, knee and arm/elbow, stemming from a SEPTA bus accident she was involved in and the injuries that she sustained from said accident.

15.    Following Plaintiff's aforesaid accident, she immediately notified Defendant's management about her aforesaid accident and the injuries she sustained to her wrist, hip and head.

16.    Plaintiff quickly realized that her injuries were far worse than she had imagined and that the disabilities stemming from her injuries were (at times) preventing her from engaging in

daily life activities, including but not limited to prolong sitting and standing, walking, lifting, and engaging in other manual tasks.

17.    Plaintiff was only able to work intermittently immediately following her aforesaid accident.

18.    Therefore, on or about October 14, 2024, Defendant's Payroll and Benefits Specialist, Rachel Piotrowski (hereinafter "Piotrowski") sent Plaintiff an email asking her to provide a doctor's note confirming that she was OK to continue working without any accommodation.

19.    Plaintiff responded to Piotrowski's request and notified her that she had a follow up appointment with her Primary Care Physician ("PCP") the next day and would let her know when she had an update.

20.    Notably, Piotrowski never indicated or told Plaintiff what to submit if her doctor believed that she was not able to return to work without accommodations.

21.    After Plaintiff met with her physician on October 15, 2024, a doctor's note was provided to Defendant asking that Plaintiff be excused from work from October 7, 2024 through October 28, 2024, as she would be undergoing therapy and recovery related to her disabilities/injuries.

22.    Plaintiff's doctor further advised Defendant's management that if there were any additional questions, they were free to contact her.

23.    On the same day that Plaintiff presented the aforementioned doctor's note to Defendant, she inquired about Defendant's leave of absence policies and what her options were for medical leave.

4

24.     In response, Defendant's Director of Human Resources, Rachele Hill (hereinafter "Hill") stated that it appeared based on Plaintiff's doctor's note that she would need intermittent time off and that if she did need a block leave, additional information would be required from her doctor.

25.     Hill's statement was quite perplexing, as Plaintiff's doctor's note clearly stated that she needed leave from October 7, 2024 through October 28, 2024 and also provided the reason for said leave of absence.

26.     Hill never informed Plaintiff what additional information was needed from her physician for a block leave and therefore, Plaintiff requested Hill to contact her PCP directly (as directed in her PCP's prior note).

27.     At this point, Plaintiff's direct supervisor, Thom Chuparkoff (hereinafter "Chuparkoff") notified Plaintiff that additional information regarding her need for medical leave was needed for "insurance purposes;" however, the information that was needed still had not been clearly communicated to Plaintiff by Chuparkoff or Defendant's Human Resources ("HR") department.

28.     Therefore, Chuparkoff requested that Plaintiff schedule a call with HR and him to further discuss the matter and the additional information that was needed.

29.     Plaintiff attempted to schedule this call on October 18, 2024, for a time that Chuparkoff would be available; however, Hill changed the time and instead called Plaintiff before the time she had requested and insisted that they meet and discuss the matter without Chuparkoff.

30.     Plaintiff complied with Hill's directive and participated in a telephone call with her on October 18, 2024 without Chuparkoff present.

31.     During her aforesaid call with HR, Hill confirmed that she would try to reach Plaintiff's PCP to gather additional information.

32.     Plaintiff also asked Hill during their call if there was any template that her physician should complete in order to better assist with providing the necessary information for medical leave.

33.     It was only after Plaintiff specifically asked for a template that Hill provided her with a medical accommodation form to have completed by her physician in order "to confirm [her] injuries warrant a fulltime medical leave or if accommodations can be made so that [she] can continue working in some capacity . . .."

34.     On October 21, 2024, Plaintiff had her first appointment with Medical Rehabilitation Centers of Pennsylvania ("MRCP") and a doctor's note was provided directly to Defendant's HR department by them, which confirmed multiple injuries to Plaintiff's wrist, elbow, hip, knee, and head and declared her totally disabled until her next follow up appointment in 4-5 weeks.

35.     Hill responded, stating that the note from MRCP was sufficient to provide Plaintiff with a block medical leave of absence.

36.     In explaining Defendant's medical leave policies, Hill advised Plaintiff of the following:

> i. Eligible employees are normally granted leave for the period of disability, up to a maximum of 12 weeks within any 12-month period. ***Any combination of medical leave and family leave may not exceed this maximum limit.***

ii.  For the purpose of confirming the 12-week timeline, Defendant was declaring October 8, 2024 as the day Plaintiff commenced medical leave and the eligibility period for the medial leave related to this incident would end on January 6, 2025.

iii.  Defendant would use 11/26/24 as a potential return to work date based on the note from MRCP.

37.  Defendant's policy that any medical leave cannot exceed a 12-week limit is a violation of the ADA, as there is no set cut off as to when an employer can terminate an employee on medical leave and whether an accommodation is reasonable should be considered on a case-by-case basis after considering the totality of the circumstances.

38.  This unlawful policy was also reiterated by Hill on October 24, 2024, when Plaintiff inquired about extending her last day of medical leave because Plaintiff had worked intermittently between October 8 and October 24th and therefore, her leave was not continuous starting on October 8, 2024 (as indicated by Hill).

39.  Specifically, Hill stated in response: "If you will be unable to return after 12-weeks, at that time your employment would end, and you could apply for long term disability through Prudential. You should start the Long-Term Disability application as soon as possible if you think that is a possibility."

40.  On or about November 6, 2024, Hill contacted Plaintiff to inquire when her next doctor's appointment was scheduled so Defendant could better understand when her return-to-work date would be.

41.  Plaintiff responded by notifying Hill that her next appointment would be on November 18, 2024 and that she would try to provide Hill with a follow up shortly thereafter.

7

42.    On November 25, 2024, Plaintiff notified Hill that she was still not cleared to return to work and would not be returning on November 26, 2024 (as previously anticipated).

43.    A doctor's note was provided to Defendant on or about November 25, 2024, confirming Plaintiff's ongoing treatment, her continued status of total disability "until further notice," and that additional MRIs were ordered to assess the extent of her disabilities/injuries.

44.    Upon receiving Plaintiff's doctor's note on or about November 25, 2024, Hill, unjustifiably, did not find this note to be sufficient and set up a time to speak with Plaintiff's physician to gain additional information that Defendant claimed it needed in order to comply with the ADA.

45.    On December 2, 2024, another doctor's note was provided to Defendant indicating that Plaintiff's return to work date would be February 7, 2025.

46.    Immediately after the December 2, 2024 doctor's note was produced to Defendant, Plaintiff was provided with notice that her company paid short-term disability benefits through Defendant would stop.

47.    After much back and forth between Plaintiff and Defendant regarding what additional documentation was needed in order to get Plaintiff's company-paid disability benefits reinstated (as Hill stated that approval of the company-paid disability benefits was within the Defendant's discretion) and despite the fact that Defendant provided no specific forms for her physician to complete in order to continue her disability benefits, Defendant ended all conversations regarding this matter and stated that its decision to stop her disability benefits would not be reversed.

48.     In or about January of 2025, Plaintiff requested the reasonable accommodation of a trial remote work period on a part-time basis in order to get her acclimated back to work following her medical leave of absence.

49.     Defendant's HR department originally denied Plaintiff's request for a part-time trial remote work period, claiming there was insufficient information as to why she needed to work remotely.

50.     Instead of granting Plaintiff's requested accommodation for a part-time trial remote work period, Defendant stated that it would provide her with the reasonable accommodation of a part-time trial period of two weeks, but that Plaintiff had to report to the office.

51.     Plaintiff explained that working remotely was key to her recovery, listed some of the challenges that an in-office arrangement would pose to her disabilities and recovery, and provided a list of reasons why remote work was feasible in her position.

52.     Plaintiff also indicated that she was willing to provide additional information to support this accommodation request, but that her physician would be out of the office until February 3, 2025 and the earliest appointment she could schedule was February 17, 2025.

53.     While waiting for her next physician's appointment, Plaintiff attempted to engage in the interactive process on her own in order to find an alternative solution to working remotely, such as Defendant paying for rideshare costs to and from work and providing her with an extra laptop to keep at home (so that she didn't need to carry it back and forth to work).

54.     However, no agreeable solution was reached, and Defendant eventually granted the accommodation of a part time remote work trial period for  two weeks between February 10, 2025 and February 21, 2025, working four hours per day between 9 a.m. and 1 p.m.

55.    Plaintiff accepted this accommodation and began working part-time on a remote basis starting February 10, 2025.

56.    As of February 18, 2025, Plaintiff began to inquire about returning to work on a full-time remote basis for six months (possibly more) and presented medical documentation to support this request, which listed her physical limitations, including: no lifting above 5-10 lbs, and no bending, twisting, squatting, stooping, prolonged standing and sitting.

57.    Plaintiff's remote work accommodation was more than reasonable and could have easily been accommodated.

58.    For example (but not intending to be an exhaustive list as to why Plaintiff's request to work remotely was reasonable):

    i.    the employees in Plaintiff's office worked remotely on Fridays (demonstrating that a hybrid or fully remote arrangement was feasible);

    ii.    almost all team members that Plaintiff collaborated with were not based out of the Philadelphia office;

    iii.    because almost all team members that Plaintiff collaborated with were not located in the Philadelphia office, Plaintiff always met and/or corresponded with her team members via Teams calls or corresponded via calls, chats, emails, Revit and Bluebeam sessions (it was very rare Plaintiff and her other team members met to collaborate in person);

    iv.    the rest of Plaintiff's duties (outside of collaborating with team members) were done on a computer; and

    v.    there were other employees who worked fully remote and/or partially remote for non-disability related reasons.

59.    On February 21, 2025, Plaintiff's request to work remotely on a full-time basis was denied.

60.    The reasons provided by Defendant as to why Plaintiff's accommodation request to work remotely was denied were not supported and easily disproven.

61.    Furthermore, despite Defendant's assertions, allowing Plaintiff to work remotely would not have created an undue hardship.

62.    After being denied the ability to work remotely, Plaintiff asked whether she would be required to stay at the office past 8:00 p.m. on days that she had Physical Therapy ("PT") appointments, considering (with travel) said appointments would last approximately 3 hours.

63.    Chuparkoff responded and stated that once Plaintiff returned to work, they could discuss and further strategize how they could accommodate her treatments.

64.    On or about March 3, 2025, Plaintiff returned to in-office work with the understanding that she would be provided with the following accommodations: an ergonomic work station, an anti-fatigue standing desk mat, and a laptop security device.

65.    Plaintiff also understood that Defendant would further discuss additional accommodations surrounding her PT appointments after she returned to work.

66.    However, as of March 4, 2025, all of the aforesaid accommodations had not been fully implemented.

67.    For example, while a standing desk had been ordered and delivered, it had not been put together and due to Plaintiff's restrictions, she needed assistance with unboxing and installation, as well as assistance with unmounting her screens and setting them up on their stationary stands to be used with the desk top riser.

11

68.	Plaintiff notified Piotrowski of these issues and inquired why a manual desk riser was chosen over a motorized standing desk.

69.	Plaintiff expressed concern that with her physical limitations, the manual desk riser would be difficult for her to operate.

70.	While Plaintiff was begrudgingly given assistance with the unboxing and installation of her desk, her concern about it being a manual desk riser with her physical limitations was ignored, and she was simply told that adjusting the desk would require little effort.

71.	After the manual desk riser was installed, Plaintiff attempted to use it; however, force was still required to adjust the manual desk riser, and the manual desk riser did not fit her desk.  The manual desk riser was clearly not feasible for Plaintiff to use given her restrictions.

72.	Plaintiff communicated the same to Piotrowski and stated that she would like to explore alternative solutions, such as a motorized standing desk.

73.	The next day, Plaintiff also emailed Piotrowski to notify her that the chair she was using was very uncomfortable and was making it difficult for her to work extended periods of time due to her disabilities.

74.	Plaintiff notified Piotrowski that she had tried switching chairs but none of the chairs in the office had the support that she needed.

75.	Plaintiff therefore asked Piotrowski if it was possible to discuss options for a more ergonomic chair as a reasonable accommodation.

76.	In response, Piotrowski suggested ergonomic cushions for the chair she was already using.

77.	Plaintiff replied that she did not believe a cushion would be sufficient and would like to discuss ergonomic chair options.

78.    Without engaging in any interactive process (such as requesting additional medical documentation, which Plaintiff would have been happy to retrieve and provide to Defendant), Piotrowski notified Plaintiff that Defendant would reimburse her up to $50.00 for any ergonomic cushion or chair of her choice but that the remaining portion of the item she chose, **as well as any additional accommodations she may need for physical discomfort**, would be at Plaintiff own expense.

79.    Plaintiff bought an ergonomic chair of her choice and did not request reimbursement from Defendant because of its clear hostility towards her need for medical accommodations.

80.    On March 12, 2025, the motorized standing desk was delivered but Plaintiff again needed assistance installing it due to her physical limitations (caused by her disabilities).

81.    Plaintiff therefore asked Piotrowski whether she could get assistance installing the desk for the reasons discussed *supra*; however, Piotrowski did not respond to Plaintiff.

82.    As a result, Plaintiff hired a company to uninstall the manual riser and to install the motorized riser at her own expense and to avoid any delays in utilizing her medically needed accommodations. Plaintiff notified Piotrowski of the same on March 17, 2025.

83.    On March 18, 2025, Plaintiff received a scathing email from Hill stating that based on the medical documentation that Defendant received to date, there was no directive requiring Defendant to install or set up any specific equipment for Plaintiff.

84.    However, Defendant had documentation describing Plaintiff's physical limitations and to expect Plaintiff to install a manual or a motorized desk with said limitations was completely absurd.

85.   When Plaintiff mentioned Defendant's knowledge of her physical limitations to Hill, she responded by stating: "Regarding the setup of your equipment, while we have made efforts to facilitate a suitable workstation, it is not the company's obligation to arrange for or provide assistance beyond what constitutes a reasonable accommodation. If you elected to engage outside assistance, that was a personal decision."

86.   As evident from the aforesaid email, Hill was clearly frustrated with Plaintiff's request for accommodations and her limitations.

87.   Notably, Piotrowski never asked Plaintiff for additional medical documentation showing that she needed an ergonomic chair or help with installing office equipment and by the time Hill told Plaintiff to provide updated medical documentation to support said needs, she had already hired her own help to install her office equipment (making the issue moot at that point).

88.   While trying to get her office equipment installed (as she was working without all accommodations in place), Plaintiff emailed Chuparkoff to discuss her 2024 Performance Evaluation, as she had been out on medical leave when other employees were issued theirs.

89.   Chuparkoff responded that Plaintiff would not be receiving an annual review because the formal review period had already been closed and the system was no longer accessible to supervisors for evaluations from that cycle.

90.   Plaintiff was also told she would not be receiving a cost-of-living raise, a performance raise, or a bonus due to the fact that she was on medical leave when recommendations for those items were discussed.

91.   Defendant's decision to deny Plaintiff a performance evaluation, a cost-of-living raise, a performance raise, and/or a bonus specifically and solely because she was out on medical leave is discriminatory and retaliatory under the ADA.

92.     Plaintiff was told by Chuparkoff that instead of receiving her 2024 Performance Evaluation, raise, and/or a bonus, she would be given a new 90-day evaluation period starting on the day she returned to work and would be assessed on workflow, responsibilities and overall performance since returning (as if she was a new employee).

93.     It was only after Plaintiff asked whether her prior performance would be taken into consideration when conducting this evaluation did Chuparkoff reluctantly indicate that they would review everything in totality.

94.     This was not the first time that Plaintiff was denied a bonus or raise.

95.     For example, after receiving a good 2023 Performance Evaluation (which took place in or about September of 2023), Plaintiff was unexpectedly placed on a Performance Improvement Plan and denied a raise and a bonus in January of 2024.

96.     The aforesaid PIP was supposed to be a 60-day PIP that got prolonged due to lack of response from Defendant's management and HR.

97.     Defendant eventually removed the January 2024 PIP in May and pulled it from Plaintiff's file completely in August of 2024 (shortly before she was involved in the aforesaid accident and went on medical leave – discussed *supra*).

98.     The two people who initiated the PIP quit shortly after Plaintiff started the PIP period.

99.     In May of 2024, during a call with Chuparkoff, Brandt, and Hill regarding ending the PIP, they began to question the legitimacy of the PIP since everyone Plaintiff had been working with spoke only good things about her work.

100.    As a result of this commentary and the January 2024 PIP's lack of legitimacy, Plaintiff asked for a raise/bonus.

15

101.    Defendant's management told Plaintiff that the books for 2023 had closed and they were not able to reopen them.

102.    However, Chuparkoff also told Plaintiff that if a certain project did well and was completed on time and under budget, that the project contract would award extra money, and she would be considered for a bonus at that time.

103.    Upon information and belief, after notifying Defendant of her disabilities and after going on medical leave, Defendant was awarded the extra money; however, Plaintiff was not considered for or provided with a bonus.

104.    After Plaintiff exchanged emails with Chuparkoff, Piotrowski, and Hill regarding her accommodations and after highlighting certain aspects of Defendant's unwillingness to assist her with transitioning back to work, Defendant's management, including Hill, began to berate Plaintiff about her medical appointments, which she told them she would need to take intermittent time off for prior to returning from medical leave (and part of the reason she was requesting to work remotely).

105.    For example, as discussed *supra*, Plaintiff understood (based on representations from Chuparkoff) that Defendant would further discuss additional accommodations surrounding her PT appointments after she returned to work from medical leave in February of 2025; however, this never happened.

106.    Therefore, Plaintiff placed her medical appointments on the calendar, made up any time that she missed from work and Defendant's management did not express any concern about the same until March 18, 2025, after Hill became observantly annoyed with her requested accommodations regarding her office equipment (as discussed *supra*).

16

107.    Plaintiff was thereafter told by Todd Brandt (Division Head – OSPORTS and Specialty Architecture – hereinafter "Brandt"), that her April 8, 2025 doctor's appointment would be the last medical appointment that Defendant would accommodate and that going forward, Plaintiff would be expected to be in the office from 7 a.m. – 5 p.m.

108.    When Plaintiff told Brandt that she had appointments scheduled for April 14, 2025 and April 16, 2025, he responded by stating that those appointments were not on her calendar and that she needed to reschedule them outside of working hours.

109.    Plaintiff clarified with Brandt that those appointments were on the S+SA out of office calendar and that she was requesting a temporary accommodation under the ADA for medical appointments related to ongoing treatment on April 14, 2025.

110.    Plaintiff told Brandt that the April 16, 2025 appointment would be taken during her 1-hour lunch.

111.    In the weeks leading up to her termination from Defendant on May 15, 2025 (discussed further *infra*), Plaintiff continued to work to the best of her ability; however, she was not provided with the proper support.

112.    For instance, when Plaintiff had questions about certain projects, she was not provided with direct answers from Defendant's management, or she was ignored completely.

113.    On or about May 15, 2025, Plaintiff was notified during a meeting Brandt, Piotrowski, and Chuparkoff that she was being terminated from her employment with Defendant allegedly because her performance was not consistent, with Chuparkoff stating that Plaintiff had not developed to the consistency of some of her peers or a senior architectural designer.

114.    After the meeting, Plaintiff spoke with Chuparkoff separately, and he stated that he did not feel as if Plaintiff had developed in the 2.5 years that she had worked for Defendant.

17

115. Defendant's allegations and reasons for her termination are completely false, as:

    i. shortly before Plaintiff's medical leave, she was told by Defendant's management that she was performing very well;

    ii. Plaintiff was notified before her aforesaid medical leave that the PIP she had been previously placed on in January 2024 was questionable, as everyone that Defendant's management had spoken to enjoyed working with her and spoke good about her work; and

    iii. even after Plaintiff's returned from medical leave, despite the roadblocks that were put in her way, she still received positive feedback from some of Defendant's management, stating that she had done a great job with certain projects.

116. To terminate Plaintiff for performance or state that she had not grown as an employee of Defendant in over 2.5 years was offensive to Plaintiff and completely pretextual.

117. Plaintiff believes and therefore avers that she was terminated for discriminatory and retaliatory reasons in violation of the ADA.

**COUNT I**
**<u>Violations of the Americans with Disabilities Act, as Amended ("ADAAA")</u>**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;**
**[3] Failure to Accommodate; [4] Hostile Work Environment)**

118. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

119. Plaintiff was subjected to a hostile work environment based on her (1) known disabilities; (2) perceived disabilities; (3) record of impairment; (4) protected activity under the ADA.

120.    Defendant failed to engage in the interactive process and/or accommodate Plaintiff's requested accommodations on multiple occasions, including ***but not limited to***, allowing her to work remotely, accommodating her medical appointments, providing her with a proper ergonomic work station, and providing assistance with setting up/breaking down office equipment.

121.    Plaintiff also avers that her (1) known disabilities; (2) perceived disabilities; or (3) record of impairment was a motivating and/or determinative factor in Defendant's decisions to deny her compensation in the form of bonuses and raises, refuse to provide her with a performance evaluation, and ultimately terminate her employment.

122.    Plaintiff also believes and therefore avers that Defendant denied her compensation in the form of bonuses and raises, refused to provide her with a performance evaluation, and ultimately terminated her employment in retaliation for engaging in protected activity under the ADA.

123.    Lastly, Plaintiff believes and avers that Defendant terminated her employment in order to avoid having to accommodate her disability.

124.    As a result of the foregoing, Defendant's conduct constitutes unlawful discrimination, retaliation, failure to accommodate, and hostile work environment in violation of the ADAAA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendant is to promulgate and adhere to a policy prohibiting discrimination in the future against any employee(s);

B.    Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's

illegal actions, including but not limited to back pay, front pay, overtime compensation, salary pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.      Plaintiff is to be awarded liquidated and/or punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate including but not limited to damages for emotional distress, pain, suffering and humiliation;

E.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.      Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)
akarpf@karpf-law.com

Dated: July 21, 2026

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Christina Ho | : | CIVIL ACTION |
| v. | : | |
| The Osborn Engineering Co. d/b/a Osports | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                  ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (x )

| | | |
|---|---|---|
| 7/21/2026 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

10/2024

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: <u>Defendants place of business</u>

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?  Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?  Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?  Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?  Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?  Yes ☐
   If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.** ***Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☒ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B.** ***Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*_____
  _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HO, CHRISTINA

**DEFENDANTS**

THE OSBORN ENGINEERING CO. D/B/A OSPORTS

**(b)** County of Residence of First Listed Plaintiff: Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Cuyahoga
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | [ ] 835 Patent – Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury – Medical Malpractice | [ ] 380 Other Personal Property Damage | | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | | [ ] 850 Securities/Commodities/ Exchange |

**PERSONAL INJURY** (second column)
- [ ] 365 Personal Injury – Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES** (continued)
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS |
|---|---|---|
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General |
| [ ] 245 Tort Product Liability | [X] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** |
| | [ ] 448 Education | [ ] 540 Mandamus & Other |
| | | [ ] 550 Civil Rights |
| | | [ ] 555 Prison Condition |
| | | [ ] 560 Civil Detainee - Conditions of Confinement |

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
ADA (42USC12101)

Brief description of cause:
Violations of the ADA and the PFPO.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE: 7/21/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____